A. H. (Herb) LAYMAN, Plaintiff in Error,

v.

READERS DIGEST ASSOCIATION, Inc., a foreign corporation, Select Magazines, Inc., a foreign corporation, and Robert Glenn White and J. I. Everest, a co-partnership doing business under the fictitious name of Oklahoma News Company, Defendants in Error.

No. 40330.

Supreme Court of Oklahoma.

Oct. 19, 1965.

Rehearing Denied March 22, 1966.

Rinehart, Rinehart & Rinehart, by Jim A. Rinehart, El Reno, Houston, Davidson & Klein, by R. L. Davidson, Jr., Tulsa, for plaintiff in error.

Martin, Logan, Moyers, Martin & Conway, by Garrett Logan, Tulsa, Charles E. Daniel, Drumright, for defendants in error Readers Digest Ass'n, Inc., and Select Magazines, Inc.

H. Dale Cook, Oklahoma City, Rinehart, Morrison & Cook, Oklahoma City, of counsel, for defendants in error Robert Glenn White and J. I. Everest.

JACKSON, Vice Chief Justice.

In the trial court, A. H. (Herb) Layman sued Readers Digest Association, Inc., Select Magazines, Inc., and Robert Glenn White and J. I. Everest, a co-partnership doing business as the Oklahoma News Company, to recover damages for the publication of an allegedly libelous article in the July, 1960, issue of Readers Digest Magazine entitled "Our Great Big Highway Bungle". The first named defendant is the publisher of the magazine; the other defendants are distributors. Plaintiff alleged that the article was false and malicious as to him; that he was therein identified as fully as if his name had been printed; that it was libelous per se; and that publication thereof had damaged him physically and financially, and had caused him humiliation and had placed him in public contempt.

After general charges of "haste, waste, mismanagement and outright graft" in connection with the Federal Highway Program, and referring to a "nightmare of recklessness, extravagance, special privilege, bureaucratic stupidity and sometimes outright thievery", the article continued as follows:

"In Oklahoma, and on one 12-mile, eight-million dollar by-pass at Tulsa, grand jury and Congressional probes have recently turned up evidence that one contractor, with the knowledge and assistance of state highway engineers and inspectors, used substandard materials, falsified delivery weights and padded bills. Highway Department employees testified that, on orders from their superiors, they actually made up samples of materials in a laboratory, instead of taking them from the roadbed, as 'proof' that specifications were met. Federal overseers on the job discovered nothing amiss at any time. Others testified that overpayments to this one contractor are estimated at $524,000.00 and that the road, completed in 1958, is already starting to crack up in places."

Plaintiff testified, among other things, that he was the senior member of a co-partnership known as Layman and Sons, which was the prime contractor on portions of the Skelly By-Pass, the road apparently referred to in the magazine article. His evidence further established that the firm of Layman and Sons was the firm referred to by the phrase "one contractor" in the article.

At the conclusion of plaintiff's evidence, the trial court sustained the defendants' demurrers to the evidence and dismissed the action. His reasons for so doing were set

out in the following remarks from the bench:

"* * * the Court finds that from any proof here, if it has been offered, if there has been any damage suffered by reason of the Reader's Digest article *it looks to me like it might be traced to Layman and Sons and not to the individual.* It is the Court's opinion that the article in and of itself is not libelous per se *in so far as this plaintiff is concerned* and I think the plaintiff has wholly failed in their proof to show damages *to this particular plaintiff* and therefore, I am going to sustain the demurrer." (Emphasis supplied.)

It is apparent from the above remarks that the trial court concluded, among other things, that there was no evidence to show that the plaintiff was the particular person referred to in the allegedly libelous article.

On appeal, plaintiff (plaintiff in error) argues that the recent case of Fawcett Publications, Inc., v. Morris, Okl., 377 P. 2d 42, is decisive of all issues, and that our holdings in that case require that this one be reversed and remanded for a new trial.

We do not agree. Although the two cases are similar in many respects, there are also important differences. The Fawcett case was essentially a "group libel" case. There, as here, the alleged libel concerned an entire group without naming any particular member, and one of the questions presented was whether there was evidence that the plaintiff, though not named, was sufficiently identified as one of the persons libeled. It was argued that since extrinsic evidence was necessary to show that plaintiff was one of the persons of whom the article was written, the defamatory matter could not be said to be libelous per se, or in and of itself. On that point, this court held:

"Whether an article is of a libelous character per se, and whether it has application to a particular party plaintiff, are entirely separate and distinct questions, and should not be confused. The answer to the first question is to be found in the article itself. The answer to the second question is to be found in the proof supporting allegations in the complaint. Those proofs may consist of either the article itself, or of extrinsic evidence."

We therefore examine the record before us with regard to the "second question" above—whether the article was understood by readers to have application to the particular party plaintiff, A. H. (Herb) Layman.

The voluminous record consists of several hundred pages of pleadings and documentary evidence and the testimony of six witnesses. The witnesses were the plaintiff Mr. Layman, who gave detailed testimony as to the history of his firm, its connection with the construction of the Skelly By-Pass, his indictment by a Tulsa grand jury and the subsequent dismissal of the indictment, and his efforts to buttress the financial position of the partnership; Mr. Hancock, an insurance agent who testified with regard to the making of surety bonds for the partnership; Mr. Hanchette, an employee of Select Magazines, who testified concerning his activities for the promotion of the sale of Readers Digest and other magazines handled by his company; Mrs. Marshall, Mr. Martin and Miss Dailey, whose testimony will be referred to hereinafter.

The documentary evidence consisted of the complete report of the "Joint Federal-State Ad Hoc Committee for the Engineering and Fiscal Re-Examination of the Skelly By-Pass"; a copy of the entire Readers Digest article entitled "Our Great Big Highway Bungle"; a copy of a contract between the Readers Digest Association and S–M News Company, the corporate predecessor of Select Magazines; copies of newspaper stories concerning the construction of the Skelly By-Pass and related matters; copies of correspondence between the Oklahoma Highway Department and the Federal Bureau of Public Roads; copies of court records showing the dismissal of grand jury indictments against plain-

tiff Layman and his sons; and a considerable amount of other documentary evidence. It may be said of the documentary evidence in this case that none of it had any bearing on the "second question" now under consideration.

Of the witnesses who testified, the last three named (Mrs. Marshall, Mr. Martin and Miss Dailey) had no connection with the construction of the Skelly By-Pass or with the publication of the allegedly libelous article. They were apparently produced by plaintiff for the purpose of showing that, in their minds at least, plaintiff was the one referred to in the magazine article.

However, they did not so testify. Mrs. Marshall testified that she thought the article referred to the Layman Construction Company and that "I think everybody knew that Layman Construction Company was the Contractor". Mr. Martin testified that to him, the article indicated "The Layman Contractors". Miss Dailey said "I thought it referred to Layman and Sons". A fair reading of all of the testimony of these three witnesses leads unerringly to the conclusion that they were referring to the partnership and not to the individual plaintiff in this case. As a matter of fact, all of these witnesses testified that they did not know Mr. Layman.

That plaintiff himself so construed their testimony is shown by the following sentence from his brief in this court:

"The evidence disclosed that the 'One Contractor' referred to in the magazine article and described as the one which grand jury and Congressional probes identified as having used sub-standard materials, falsified delivery weights and padded bills, was *the co-partnership of Layman and Sons.*" (Emphasis supplied.)

At this point the distinction between the Fawcett case and the one now before us becomes evident: in the Fawcett case there was evidence that readers of the article understood plaintiff to be a prominent member of the football team and one of those referred to in the libelous article. The

evidence in that case showed that "many people asked plaintiff about the article in True (magazine), beginning shortly after its publication, and continuing until shortly before trial". In the case now before us there is no evidence that readers of the publication understood that plaintiff A. H. (Herb) Layman was the one referred to in the article.

In the instant case the readers of the article, (Mrs. Marshall, Mr. Martin and Miss. Dailey) were satisfied that the article referred to "Layman Construction Company", "The Layman Contractors" or "Layman and Sons". These witnesses testified that they did not know Mr. Layman. Thus, they did not understand that the article referred to A. H. (Herb) Layman, but that it referred to a contractor known to them by one of the names mentioned.

It is well settled that "The language used must, however, be such that persons reading or hearing it will, in the light of surrounding circumstances, be able to understand that it refers to the person complaining, and it must have been so understood by at least one other person * * *"; 33 Am.Jur., Libel and Slander, Sec. 89 at page 102. To the same general effect, see 91 A. L.R. 1169; and Golden North Airways v. Tanana Publishing Co., 218 F.2d 612, 622, 15 Alaska 303.

■ It may be observed that the question of whether the publication was libelous per se as to the partnership is not before us at this time because the partnership is not the plaintiff in this action. Since there is no evidence that the article was understood by plaintiff's witnesses to refer to A. H. (Herb) Layman, it cannot be said to be libelous as to him.

In this connection, plaintiff says in his brief:

"The law seems to be well settled that a partnership, in the absence of a statute to that effect is not regarded as a separate entity like a corporation, in suits for libel and slander * * *".

 No specific authority is cited for this statement, and our own extensive research has disclosed none. We are aware of general statements in some of the older texts, not limited to libel and slander cases, to the effect that a partnership, in the absence of a statute to that effect, is not ordinarily regarded as a separate legal entity like a corporation. 20 R.C.L. 805. Later authorities note that the concept of a partnership as a separate legal entity seems to be growing in popularity. 40 Am.Jur. Partnership, Sec. 18. Be that as it may, it has been settled for many years in this jurisdiction that a partnership *is* a separate legal entity. Heaton v. Schaeffer, 34 Okl. 631, 126 P. 797, 43 L.R.A., N.S., 540; Holmes v. Alexander, 52 Okl. 122, 152 P. 819; Southard v. Oil Equipment Corp., Okl., 296 P.2d 780. Plaintiff has suggested no reason why a different rule should obtain in libel and slander cases, and we know of none.

Since a partnership is a separate legal entity, a libel of the partnership of Layman and Sons is an entirely different thing from a libel of A. H. (Herb) Layman. For damages accruing to the partnership a suit by or on behalf of the partnership might have been brought, but this was not done. Plaintiff's petition recites that "he brings this action personally and in his individual capacity", and it is not contended that the action was for partnership damages.

 The Readers Digest article did not name the plaintiff, A. H. (Herb) Layman. Under our holdings in the Fawcett case, this circumstance would not have been fatal to plaintiff's case, if his witnesses had understood that the article actually referred to him. They did not do so. See Am.Jur. Libel and Slander, Sec. 89, to the following effect:

> "In order to entitle one to maintain an action for an alleged defamatory statement, it must appear that he is the person with reference to whom the statement is made."

In view of our conclusions above, it is unnecessary to consider the other arguments raised in the briefs.

The judgment of the trial court is affirmed.

DAVISON, BLACKBIRD, IRWIN, BERRY, HODGES and LAVENDER, JJ., concur.

HALLEY, C. J., concurs in result.

WILLIAMS, J., dissents.